## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MONTANA

| | |
|---|---|
| In re: | Case No. 4:22-bk-40035-WLH |
| EAGLE BEAR INC., | |
| Debtor. | ***AMENDED*** **MEMORANDUM OPINION** |

As the idiom goes, nothing is certain except death and taxes. But sometimes there is uncertainty about the applicability or amount of an asserted tax, which can lead to disputes and thus require courts to decide the extent of any tax owed.

In this case, debtor Eagle Bear Inc. objects to the Blackfeet Indian Nation's claims for various taxes and other amounts. The court has fully considered the record and arguments developed by the parties and now resolves these disputes.

### BACKGROUND & PROCEDURAL POSTURE

Since approximately April 1996, Eagle Bear has operated a Kampgrounds of America (or KOA) campground and recreational facility on real property owned by the Blackfeet Nation. For at least some period of time, the relationship between Eagle Bear and the Blackfeet Nation was governed in part by a *Recreation and Business Lease Agreement* entered into as of April 11, 1997 (the "Lease").[1]

After many years of disputes between Eagle Bear and the Blackfeet Nation, Eagle Bear filed a chapter 11 bankruptcy petition in mid-2022. Eagle Bear continues to operate its business as a debtor in possession.

The Blackfeet Nation filed a proof of claim in the bankruptcy case, which proof of claim was designated as claim number 11 and has been amended several times. In its proof of claim, the Blackfeet Nation asserts rights to payment under the Lease, several tribal laws, and Bankruptcy Code section 507(a)(8).

---

[1] ECF No. 209 Ex. 5; ECF No. 211 Ex. A. The parties have longstanding disputes about, among other things, whether and when the Lease may have been terminated. These matters are the subject of active litigation before Chief Judge Brian M. Morris of the United States District Court for the District of Montana. The court expresses no views regarding any matter pending before District Judge Morris.

Eagle Bear objected to the Blackfeet Nation's proof of claim and the court conducted an evidentiary hearing on August 14 and 15, 2023. At the hearing, the court admitted numerous exhibits and deposition excerpts.[2] The parties presented the following testimony:

- **Danielle Weber (testimony via Zoom)**. Ms. Weber is an accountant with Holmes & Turner, which has prepared tax returns and provided other accounting services for Eagle Bear. Ms. Weber testified about certain schedules included with Eagle Bear's 2021 federal income tax return, including information and calculations contained in the related 2021 federal depreciation schedule. The court found Ms. Weber professional and credible. Ms. Weber's testimony was narrowly focused and easy to follow.

- **William Brooke**. Mr. Brooke is one of Eagle Bear's owners and longtime managers. Mr. Brooke testified about an array of subjects, including (i) the history of Eagle Bear and the campsite; (ii) his understanding of the terms and conditions of the Lease, as well as certain laws, rules, and regulations applicable to Eagle Bear;[3] (iii) various interactions and communications among Eagle Bear, the Blackfeet Nation, and the Bureau of Indian Affairs (or BIA) over the years; (iv) his experience regarding whether competing or similar campsites charge tribal or state lodging taxes; (v) pending litigation against the State of Montana regarding tax issues; and (vi) theoretical calculations prepared by Eagle Bear regarding the possible amounts of some of the Blackfeet Nation's claims in certain scenarios. Overall, the court found Mr. Brooke honest and sincere in his testimony, although at times he was somewhat antagonistic toward the Blackfeet Nation's counsel.

- **Joe Gervais**. Mr. Gervais is the Treasurer of the Blackfeet Nation. Most of Mr. Gervais's testimony focused on his calculations and underlying assumptions regarding the specific amounts of the Blackfeet Nation's asserted claims. Mr. Gervais also provided his layperson's opinion and understanding regarding tribal laws and practices applicable to Eagle Bear's business. The court generally found Mr. Gervais credible, including when

---

[2] *See* ECF Nos. 216, 217.

[3] Mr. Brooke is a law school graduate and practiced law before shifting to the campground business. Mr. Brooke was not, however, offered as an expert regarding any of the tribal or other laws at issue in this case; therefore, the court treats his testimony about those subjects as the articulation of his layperson's opinion and understanding. In any event, the tasks of determining the law and applying the law to the facts ultimately fall to the court, rather than to any witness. *See, e.g.*, *Pinal Creek Grp. v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1042–44 (D. Ariz. 2005).

he admitted that certain issues were beyond his knowledge and when he testified that the Blackfeet Nation's practices regarding lodging taxes are partially inconsistent with the Blackfeet Nation's asserted claim amounts.

The court requested post-hearing briefing and heard closing argument. The matter is now ready for decision.

## GENERAL PRINCIPLES

### Jurisdiction & Power

The court has subject matter jurisdiction regarding this bankruptcy case and Eagle Bear's claim objection pursuant to 28 U.S.C. §§ 157(a) & 1334(b) and Standing Order No. BMM-20 (D. Mont. Aug. 19, 2022). The parties' disputes regarding the allowance or disallowance of claims against the bankruptcy estate are statutorily "core" and the issues presented will "be completely resolved in the bankruptcy process of allowing or disallowing claims."[4]

Bankruptcy Code section 106(a) "unequivocally abrogates the sovereign immunity of any and every government that possesses the power to assert such immunity," including federally recognized Indian tribes, for purposes of myriad Bankruptcy Code sections.[5] Bankruptcy Code section 502 (governing the allowance of claims or interests) is included in section 106(a)'s list, which means a governmental unit cannot assert sovereign immunity as a defense during the claims-allowance process.[6] Indeed, the law has recognized for generations that the claims-allowance process is an inherent part of the bankruptcy system and that bankruptcy courts should therefore fully resolve the entitlements of any parties choosing to assert claims against the estate, specifically including governments.[7]

---

[4]    *See* 28 U.S.C. § 157(b)(2)(B); *Stern v. Marshall*, 564 U.S. 462, 487 (2011).

[5]    *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388 (2023).

[6]    11 U.S.C. §§ 106(a), 502. *See also id.* § 106(b)–(c) (specific waivers of sovereign immunity regarding "a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose" and regarding "offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate").

[7]    *See, e.g.*, *Gardner v. New Jersey*, 329 U.S. 565, 573–74 (1947) (Douglas, J.) (explaining how the claims-allowance "process is, indeed, of basic importance in the administration of a bankruptcy estate whether the objective be liquidation or reorganization," including because "[t]he whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a *res*"); *Wiswall v. Campbell*, 93 U.S. 347, 351 (1876) ("Every person submitting himself to the jurisdiction of the bankrupt court in the progress of the cause, for the purpose of having his rights in the estate determined, makes himself a party to the suit, and is bound by what is judicially determined in the legitimate course of the proceeding. A creditor who offers proof

Based on the foregoing, this court may properly exercise the jurisdiction and judicial power necessary to finally decide all the parties' disputes regarding the Blackfeet Nation's proof of claim.

### *Allocation of Burdens*

The bankruptcy claims process involves a series of shifting presumptions and burdens. Proofs of claim that are "executed and filed in accordance with" the Federal Rules of Bankruptcy Procedure "constitute prima facie evidence of the validity and amount of the claim" and will be "deemed allowed" unless a party in interest objects.[8] If an objection is filed, then "the party objecting to a proof of claim has the burden of presenting substantial factual basis to overcome the prima facie validity of a proof of claim and the evidence must be of probative force equal to that of the creditor's proof of claim."[9] If the objector meets this shifted burden, then the burden reverts back to the claimant to prove up its claim by a preponderance of the evidence, which means "[t]he ultimate burden of persuasion remains at all times upon the claimant."[10] In attempting to meet this ultimate burden, the claimant can no longer rely on the initial evidentiary effect of the proof of claim and must produce additional admissible evidence to prove the claim's validity.[11] Likewise, the objector is not required to disprove the asserted claim.[12] "The burden is, therefore, just as it would be in a non-bankruptcy lawsuit in which the creditor is attempting to recover money from the debtor."[13]

Here, the Blackfeet Nation filed a proof of claim that carried prima facie force, but Eagle Bear satisfied its burden of presenting a substantial factual basis to overcome that prima facie validity, including the testimony and exhibits offered by Eagle Bear at the evidentiary hearing. As such, the Blackfeet Nation must now be held to its ultimate burdens of proof and persuasion, including establishing all necessary elements of the asserted claims by a preponderance of the evidence.

---

of his claim, and demands its allowance, subjects himself to the dominion of the court, and must abide the consequences.").

[8] 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f).

[9] *Reger v. Essex Banks (In re Landes)*, 626 B.R. 531, 545 (Bankr. E.D. Cal. 2021) (citing authorities).

[10] *See, e.g.*, *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000).

[11] *See, e.g.*, *In re Fidelity Holding Co.*, 837 F.2d 696, 698 (5th Cir. 1988).

[12] *See, e.g.*, *In re Kahn*, 114 B.R. 40, 44 (Bankr. S.D.N.Y. 1990). Avoiding a framework in which the objecting party has the ultimate burden of disproving the claim sensibly reflects the reality that "as a practical matter it is never easy to prove a negative." *Elkins v. United States*, 364 U.S. 206, 218 (1960).

[13] *In re Wilhelm*, 173 B.R. 398, 401 (Bankr. E.D. Wis. 1994).

*Applicable Nonbankruptcy Law*

Bankruptcy Code section 502(b) contains several bases for disallowance of bankruptcy claims, including when "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."[14] Section 502(b)(1) thus operates to disallow "any claim unenforceable under applicable nonbankruptcy law."[15]

Federally recognized Indian tribes have a right to make and be ruled by their own substantive law in internal matters as a result of their retained sovereignty.[16] As such, for purposes of the disputes now before the court, the tribal law of the Blackfeet Nation applicable to business activities occurring on the Blackfeet Indian Reservation is the applicable nonbankruptcy law, which in turn means the Blackfeet Nation must establish that its asserted claims are enforceable rights to payment under such law.

Neither party has cited—and the court's own research has not revealed—any special principles that should guide a bankruptcy court's application of substantive tribal law.[17] Therefore, in the absence of binding precedent from the Blackfeet Tribal Court (which neither party cites regarding any of the issues presented), this court's role is to predict what decision that "court would make if faced with the same facts and issue," which in turn allows this court to consider "decisions of other states, federal decisions, and the general weight and trend of authority."[18]

---

[14]   11 U.S.C. § 502(b)(1).

[15]   *E.g.*, *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1052 n.15 (9th Cir. 2002).

[16]   *See, e.g.*, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978); *Williams v. Lee*, 358 U.S. 217, 220 (1959).

[17]   Federal courts generally seem reluctant to decide disputes about substantive tribal law and will often abstain or otherwise defer in favor of resolution by an appropriate tribal court. *See, e.g.*, *In re Adams*, 133 B.R. 191 (Bankr. W.D. Mich. 1991). No party has requested such relief here and abstaining at this point would be inconsistent with the interests of judicial and party economy given the effort that has already gone into a multiday evidentiary hearing and related briefing. In addition, the court takes judicial notice of the fact that the Blackfeet Tribal Court deferred in favor of this court's resolution of "any monetary damages owed" and "the money portion" of the disputes between Eagle Bear and the Blackfeet Nation. *See* ECF No. 155-1 at p. 3 of 4. Given this prior deference, there would be a problematic circularity created if this court now deferred to the Blackfeet Tribal Court instead of just deciding the issues presented. *Cf. Weiss v. La Suisse, Societe d'Assurances sur la Vie*, 313 F. Supp. 2d 241, 244 (S.D.N.Y. 2004) (describing the need for courts "to avoid the dreaded renvoi" that can result from circular choice-of-law rules).

[18]   *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1998). *See also, e.g.*, *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1171 (9th Cir. 2001) (discussing how a federal court may consider "legal sources such as statutes, treatises, restatements, and published decisions," as well as "pertinent decisions from other jurisdictions," when engaging in a predictive exercise).

*Statutory Claim Priority*

In crafting federal bankruptcy law, Congress codified an ordered list of ten categories of "priority" claims.[19]  Classification of a given debt as a priority claim, among other things, affords that claim a privileged position in the distributional waterfall and imposes limitations on how that claim may be treated in a chapter 11 plan.[20]  In light of these consequences and the resulting deviations from "the equal distribution objective underlying the Bankruptcy Code," section 507(a) must be "tightly" or "narrowly" construed.[21]  When deploying this strict construction, a particular claim "must fit clearly within the requirements of the priority statute to be accorded priority status" and any claimant "seeking to establish a priority claim bears the burden of proving that the party's claim qualifies for priority status."[22]

The eighth category of priority claims encompasses numerous varieties of taxes owed to governmental units, but often subject to detailed temporal and other limitations.  Close and careful focus on the finer attributes of a particular asserted tax claim is often required to determine whether that claim actually falls within the scope of Bankruptcy Code section 507(a)(8).

## ANALYSIS OF SPECIFIC CLAIM CATEGORIES

The Blackfeet Nation's proof of claim includes several distinct categories of claims.  Because the legal analysis regarding each category is largely self-contained, the court addresses the categories separately.

*Interest on Late Rental Payments*

The Blackfeet Nation proof of claim asserts a general unsecured claim in the aggregate amount of $24,922.33 based on allegedly unpaid interest accruing on rental payments that Eagle Bear did not timely pay under the Lease during 1997 through 2007 (after which the Blackfeet Nation contends the Lease was cancelled).

---

[19]  *See* 11 U.S.C. § 507(a).

[20]  *See id.* §§ 726(a)(1), 1129(a)(9).

[21]  *Howard Delivery Serv. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006).  *See also, e.g.*, *United States v. Alicea*, 58 F.4th 155, 159 (4th Cir. 2023); *Cal. Self-Insurers Sec. Fund v. Lorber Indus. of Cal. (In re Lorber Indus. of Cal.)*, 564 F.3d 1098, 1100–01 (9th Cir. 2009); *Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 479 F.3d 167, 172 (2d Cir. 2007) (Sotomayor, J.).

[22]  4 COLLIER ON BANKRUPTCY ¶ 507.01(16th ed. rev. 2023).

Eagle Bear agreed in the Lease to pay a formula-driven "annual rental on November 30th of each year this agreement is in effect."[23] Past due rental payments will "bear interest at the prime rate of interest as published in the Wall Street Journal plus three percent (3%) per annum from the due date until paid" and this interest "will become due and payable from the date such rental becomes due and will run until said rental is paid."[24]

Eagle Bear apparently paid rent late every year between 1997 and 2007 other than 2006. The Blackfeet Nation thus asserts claims for interest on these late rental payments, which the Blackfeet Nation has calculated by (i) multiplying the amount of each late rental payment times the applicable floating-rate interest in a given year applied on a per-diem basis times the number of days the payment was late, thereby yielding an initial unpaid interest component for each year; and (ii) accruing additional interest on each initial unpaid annual component for each subsequent year through the 2022 petition date.[25]

Eagle Bear argues that these claims are barred by the applicable statute of limitations.[26] More specifically, Eagle Bear points to Blackfeet Tribal Ordinance No. 51, which amended tribal law regarding the period of limitations to create a general two-year limitations period, subject to the proviso that any actions "brought on behalf of the Tribe to recover a debt owing to the Tribe in the amount of $5,000.00 or over shall have no prescribed period of limitations."[27]

The initial unpaid interest component for each specific year as to which the Blackfeet Nation asserts a claim is less than $5,000 but the total asserted sum exceeds $5,000, which prompts a question about what is the relevant "debt" for purposes of applying the statute of limitations created by Blackfeet Tribal Ordinance No. 51. The court concludes that the relevant "debt" is the amount that would be due and payable under the Lease in any given year. Many courts in analogous contexts have held that multiple distinct "debts" can arise over time under a single contract—for example, each periodic payment due on an unaccelerated home mortgage note, commercial lease, or other installment contract

---

[23] Lease ¶ 5(A).

[24] *Id.* ¶ 6.

[25] *See* Proof of Claim No. 11-4 at p. 5 of 12.

[26] Any applicable statute of limitations defense is expressly made available to the bankruptcy estate representative, *see* 11 U.S.C. § 558, and a bankruptcy claim based on a time barred debt is subject to disallowance under Bankruptcy Code section 502(b)(1), *see Midland Funding, LLC v. Johnson*, 581 U.S. 224, 229 (2017).

[27] *See* ECF No. 215 Ex. HHHH.

is considered a distinct "debt" that triggers the statute of limitations regarding that specific payment, even though additional debts will continue to accrue and become payable in the future.[28] When Eagle Bear paid a particular year's rent late, that late payment crystalized a distinct claim for interest owed on the unpaid installment amount under the Lease, which the Blackfeet Nation (or perhaps the BIA acting on behalf of the Blackfeet Nation) could have potentially sought to collect from Eagle Bear. If that distinct debt was less than $5,000 (and it was every year), then any action to recover the debt would be subject to the general two-year limitations period, which period has long since lapsed regarding all the years at issue.[29]

Because every debt included within this category of claims is unenforceable against Eagle Bear based on the statute of limitations created by Blackfeet Tribal Ordinance No. 51, Eagle Bear's objection to this category of claims will be sustained and the Blackfeet Nation's claims for interest on late rental payments will be disallowed in their entirety.[30]

### Lodging Taxes

The Blackfeet Nation proof of claim asserts a priority tax claim in the aggregate amount of $4,066,817.73 based on allegedly past due pass-through taxes chargeable by Eagle Bear to guests at the campsite during the period from 1997 to 2019 and in 2021, plus interest on the claimed unpaid taxes.[31]

---

[28] *See, e.g., Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 208–09 (1997); *H.M. Chase Corp. v. Idaho Potato Processors, Inc.*, 529 P.2d 1270, 1274 (Idaho 1974); *Fulton v. Fulton*, 97 P.3d 573, 575–76 (Mont. 2004); *Bank of N.Y. v Hutchinson*, 190 A.D.3d 804, 806 (N.Y. App. Div. 2021); *Martin v. Ray Lackey Enters., Inc.*, 396 S.E.2d 327, 357–58 (N.C. Ct. App. 1990); *Garden Ridge, L.P. v. Clear Lake, L.P.*, 504 S.W.3d 428, 446 (Tex. App. 2016); *Herzog v. Herzog*, 161 P.2d 142, 144–45 (Wash. 1945).

[29] Assuming, solely for the sake of completeness, that the BIA is the proper party to assert a claim for interest on late rent under the Lease and that the BIA would not be constrained by Blackfeet Tribal Ordinance No. 51, the arguably alternative limitations period of six years and ninety days would have likewise lapsed long before the petition date. *See* 28 U.S.C. § 2415(a). As such, the end result (to wit, the claim is time barred and subject to disallowance under Bankruptcy Code section 502(b)(1)) would be the same.

[30] Since this ruling suffices to resolve matters regarding this category of claims, the court does not address Eagle Bear's various other theories and arguments, including regarding how the claim was calculated and whether discovery responses by the BIA bar the claim. *See, e.g., Turner v. United States Parole Comm'n*, 810 F.2d 612, 613 n.3 (7th Cir. 1987) (highlighting federal courts' "general duty to avoid deciding unnecessary issues"); *Foster v. First Interstate Bank (In re Shoot the Moon, LLC)*, 635 B.R. 568, 573 n.20, 580 n.62 (Bankr. D. Mont. 2022) (following this rule).

[31] The Blackfeet Nation's briefing references correspondence sent by Eagle Bear's counsel in July 2017 stating that Eagle Bear would "hold [certain] funds in escrow" pending resolution of the parties' dispute about applicability of the lodging tax, *see* ECF No. 211 Ex. RR, and argues that the court "should order that Eagle Bear fund the escrow account and release it to the Blackfeet Nation," *see* ECF No. 233 ¶ 52. It is unclear if the

Blackfeet Tribal Business Council Resolution No. 162-92 enacted a lodging facility use tax that is now contained in the Blackfeet Lodging Tax Code.[32] Blackfeet Lodging Tax Code section 1.5(a) imposes "on the user of a lodging facility within the Reservation a tax at a rate equal to six percent (6%) of the accommodation charges collected by the facility."[33] Section 1.8(a) requires "[t]he owner or operator of a facility" to collect this tax from users of the facility, in exchange for which section 1.5(b) allows the owner or operator "to retain one percent (1%) of the lodging tax for administrative costs and expenses." Section 1.8(b) imposes direct liability on the owner or operator "for all amounts required to be collected as a tax under this Code, and with respect thereto, the owner or operator shall be considered the taxpayer."

Eagle Bear and the Blackfeet Nation have many disagreements and arguments about whether and how the lodging facility use tax creates liability for Eagle Bear, which the court addresses in conceptual steps.

## I.     Does Eagle Bear Have Any Liability for this Tax?

Eagle Bear offers two arguments why it has no liability for the lodging tax.

**First**, Eagle Bear contends that the payment schedule in the Lease was intended to displace the lodging tax and that the Blackfeet Nation agreed to accept a royalty sum as part of its rental payments under the Lease in lieu of imposing any lodging tax. Eagle Bear's argument is based largely on Mr. Brooke's testimony

---

Blackfeet Nation is attempting to recreate what it contends should have been a partially secured claim or trust relationship, but such relief (i) is not contained within the Blackfeet Nation's proof of claim, which does not assert any secured claims or trust relationships; and (ii) would not be possible given that the steps necessary to segregate and create an enforceable security interest or trust were not taken before the petition date, *see, e.g.*, *Foothill Capital Corp. v. Clare's Food Mkt. (In re Coupon Clearing Serv., Inc.)*, 113 F.3d 1091, 1099–1103 (9th Cir. 1997). If instead the Blackfeet Nation is suggesting that the failure to fund the promised escrow account violated an obligation Eagle Bear owed the Blackfeet Nation, this theory (i) similarly is not contained within the Blackfeet Nation's proof of claim; and (ii) would in any event be predicated on damages (i.e., an ultimate failure to satisfy lodging taxes owed by Eagle Bear) that are wholly duplicative of the properly asserted claim for the underlying taxes, *see, e.g.*, *JJCC Real Estate LLC v. Brooklyn Renaissance, LLC (In re Brooklyn Renaissance, LLC)*, 556 B.R. 68, 78 (Bankr. E.D.N.Y. 2016); *Irving v. School Dist. No. 1-1A*, 813 P.2d 417, 420 (Mont. 1991). Finally, this correspondence was part of an attempt to compromise with the Blackfeet Nation and thus counsel's proposal of an escrow mechanism cannot be used "to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a).

[32]   *See* ECF No. 209 Ex. 30; ECF No. 211 Ex. Q.

[33]   Blackfeet Lodging Tax Code section 1.4 defines various terms, including "Campground," "Facility," and "Lodging," in a fashion that brings Eagle Bear's campsite within the scope of section 1.5(a).

about his understanding of the parties' agreement through his participation in the negotiation of the Lease.

The details of the parties' transaction are set forth in a lengthy written Lease that was approved and signed by the BIA. Eagle Bear offers no evidence outside of the Lease to suggest that the Blackfeet Nation or the BIA ever shared Mr. Brooke's understanding of the terms of their transaction. As such, if Mr. Brooke's subjective understanding departs from the provisions of the Lease, that apparent unilateral mistake (at least without evidence of fraud by the Blackfeet Nation, which is not an argument Eagle Bear pursues) provides insufficient grounds on which to deviate from the written agreement.[34]

The terms of the Lease do not support Eagle Bear's position. There is no provision of the Lease stating that the Blackfeet Nation waived the lodging tax or that the required rental payments displaced the lodging tax. This absence is important because paragraph 37 of the Lease contains a partial waiver of certain construction taxes, which suggests the parties would have expressly stated that the lodging tax is waived or displaced if that was their agreement.[35] Additionally, paragraph 11 of the Lease requires Eagle Bear to "abide by all laws, regulations and ordinances of the Blackfeet Nation, in force and effect during the term of this lease," which would include any tribal tax laws applicable to Eagle Bear or its operations, such as the lodging tax. Furthermore, paragraph 19 of the Lease contains a covenant by Eagle Bear designed to keep the underlying real property free of liens or other encumbrances, including by requiring Eagle Bear to pay "all taxes . . . levied during the term of this lease upon or against the leased land . . . for which either the Lessee or Lessor may become liable." The lodging tax triggers the covenant in paragraph 19 because Blackfeet Lodging Tax Code section 1.13(e) provides that "[i]f the tax, or any portion of the tax, is not paid when due, the amount of unpaid tax shall be a lien on the facility," thereby levying the tax against the campsite. Eagle Bear's citation to paragraph 27 of the Lease—which generally waives whatever rights the Blackfeet Nation may have to regulate the facility—is unavailing since that waiver is subject to an "except as otherwise provided in this Agreement" proviso and the covenants mandating payment of the lodging tax by

---

[34] *See, e.g.*, *Hampton v. Ford Motor Co*., 561 F.3d 709, 714 (7th Cir. 2009); *Devin Tool & Supply Co. v. Cameron Iron Works, Inc*., 784 F.2d 623, 626 (5th Cir. 1986); *Zugelter v. Bank of Am. Nat'l Trust Fund & Sav. Ass'n*, 728 F.2d 218, 220–21 (3d Cir. 1984); *Indus. Indem. Co. v. Aetna Cas. & Sur. Co*., 465 F.2d 934, 937 (9th Cir. 1972); *In re Shoot the Moon, LLC*, 635 B.R. at 576–78.

[35] *See, e.g.*, *Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Constr. Co*., 932 F.2d 1443, 1449 (11th Cir. 1991) ("The doctrine of *expressio unius est exclusio alterius* instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded.").

Eagle Bear are "otherwise provided" in paragraphs 11 and 19 of the Lease. Finally, assuming solely for purposes of analysis that some part of the Lease could be read to indirectly waive the Blackfeet Nation's power to impose a lodging tax on Eagle Bear's operations, such an interpretation would nevertheless fall short of the legal requirement that contractual forfeitures of a sovereign's enduring powers (such as the power to tax) must occur using unmistakable terms.[36]

In sum, if the parties' bargain included an agreement by the Blackfeet Nation to waive or limit the lodging tax, then the Lease should have included some language directly and unmistakably stating that agreement. There is nothing in the Lease's four corners that directly states or even implies such an agreement and the relevant provisions of the Lease support the opposite conclusion. Since there is no other evidence in the record aligning with Mr. Brooke's testimony about this issue, the court cannot conclude that the parties contractually agreed to exempt Eagle Bear from any lodging tax liability.[37]

***Second***, Eagle Bear argues that it is being singled out by the Blackfeet Nation is a fashion that violates Eagle Bear's rights to due process[38] and equal protection.

The Indian Civil Rights Act (the "Act"), 25 U.S.C. § 1302(a)(8), prohibits an Indian tribe in the exercise of its powers of self-governance from "denying to any

---

[36] *See, e.g.*, *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 52 (1986) (reciting general legal principle); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982) (specifically rejecting notion that leases with an Indian tribe waived the tribe's taxing powers because those leases did not "contain the clear and unmistakable surrender of taxing power required for its extinction").

[37] Contrary to Eagle Bear's argument, this conclusion does not render the Lease illusory. Rental payments under the Lease can coexist with the Blackfeet Nation's tax schemes despite the reality that the taxes might have some economic impact on the value of the business predicated on the Lease. This is true in many contexts; for example, a party may need to be licensed by a state to sell gasoline, tobacco, or financial investment products and the state could simultaneously impose highly onerous taxes on the products that diminish the economic value of the associated licenses. While the power to tax may in some circumstances be the power to destroy, governments can still wield that power (subject to political processes) to significantly deter (or to encourage) particular business activity. Here, the lodging tax arises under a generalized tax law that predated the Lease, which means any theoretical power to destroy the value of the Lease by increasing the tax has not been exercised. To avoid any doubt, the court expresses no views regarding any future changes that the Blackfeet Nation may wish to make to the lodging tax.

[38] Eagle Bear summarily asserted a violation of its due process rights but did not provide any substantive argument or authority in support of the assertion. Without citation to authority or any supporting facts on the record, the court is unable to conclude Eagle Bear's due process rights were violated. *See also, e.g.*, *Iraheta-Martinez v. Garland*, 12 F.4th 942, 959 (9th Cir. 2021) (explaining how arguments not developed in opening briefs are forfeited).

person within its jurisdiction the equal protection of its laws . . . ."[39]  As presented, Eagle Bear's application of the Act raises two threshold questions, neither of which were briefed by the parties.  First, does the Act provide a mechanism by which this court can grant Eagle Bear the relief it seeks against the Blackfeet Nation?[40] And second, do the equal protection rights accorded by the Act parallel the equal protection rights guaranteed by the Fourteenth Amendment?[41]  While the answers to these questions could serve as separate bases on which to dispose of Eagle Bear's equal protection claim, the court leaves their resolution for another day given the absence of proof on the record to support Eagle Bear's claim.  Even assuming the Act and equal protection principles apply as argued by Eagle Bear, the record does not support a finding that the Blackfeet Nation has intentionally singled out Eagle Bear as a "class of one" in its lodging tax enforcement.

To prevail under a "class of one" theory, Eagle Bear must demonstrate that the Blackfeet Nation (i) intentionally (ii) treated Eagle Bear differently than other

---

[39]  The Act generally "imposes certain restrictions upon tribal governments similar, but not identical, to those contained in the Bill of Rights and the Fourteenth Amendment."  *Santa Clara Pueblo*, 436 U.S. at 57.  The Act did not serve to extend constitutional requirements to tribal governments "in wholesale fashion" but "selectively incorporated and in some instances modified the safeguards of the Bill of Rights to fit the unique political, cultural, and economic needs of tribal governments."  *Id.* at 62 (citing legislative history).

[40]  The Act's plain language, as well as Ninth Circuit precedent found during the court's research, arguably caution against application of the Act in this context.  *See Snow v. Quinault Indian Nation*, 709 F.2d 1319, 1323 (9th Cir. 1983) (concluding that the claimant must submit his denial of equal protection claim regarding implementation of a tribal tax to the tribal court because "Ninth Circuit law is well settled" that "[t]he only express remedial provision available to a party seeking relief in federal courts for an alleged violation of the [Act] is through application for habeas corpus relief under 25 U.S.C. § 1303" (citing *Boe v. Fort Belknap Indian Cmty. of Fort Belknap Reservation*, 642 F.2d 276, 278–79 (9th Cir. 1981))).  *See also Santa Clara Pueblo*, 436 U.S. at 72 (stating that the Act "does not impliedly authorize actions for declaratory or injunctive relief against either the tribe or its officers").  Using a claimed violation of the Act as a mechanism to defeat a proof of claim filed in a bankruptcy court arguably is inconsistent with the limited relief discussed in these opinions.

[41]  Here too, decisions from various courts of appeals arguably caution against a carte blanche reading of federal constitutional principles into the Act's companion provisions.  *See, e.g.*, *Tom v. Sutton*, 533 F.2d 1101, 1104, 1104 n.5 (9th Cir. 1976) (concluding that the Act does not provide counsel for indigent defendants in criminal cases as is guaranteed under the Sixth and Fourteenth Amendments and noting in passing (while citing supporting cases) that "equal protection" as used in the Act is not always given the same meaning as the phrase has come to represent under the federal Constitution); *Wounded Head v. Tribal Council of Oglala Sioux Tribe of Pine Ridge Reservation*, 507 F.2d 1079, 1082 (8th Cir. 1975) (explaining that a holding that the Act "is not coextensive with the [F]ourteenth [A]mendment embodies the concept that the federal courts should not, absent explicit legislation to the contrary, interfere with the internal governmental affairs of Indian tribes"); *Groundhog v. Keeler*, 442 F.2d 674, 681–82 (10th Cir. 1971) (rejecting the contention that the Fifth Amendment's due process clause, the Fourteenth Amendment's equal protection and due processes clauses, and the provisions of the Fifteenth Amendment were made applicable to a tribe by the passage of the Act).  *Cf. Howlett v. Salish & Kootenai Tribes of Flathead Reservation*, 529 F.2d 233, 237–38 (9th Cir. 1976) (acknowledging that section 1302(a)(8) of the Act "is not coextensive with the [F]ourteenth [A]mendment" but finding that the Act should embrace the Fourteenth Amendment's equal protection clause in that particular case because the tribe's "election and voting procedures are parallel to those commonly employed in Anglo-Saxon society").

similarly situated campgrounds (iii) without a rational basis.[42]  By way of proof, Eagle Bear relies on excerpts from the Blackfeet Nation's general ledger[43] and copies of a collection of registration receipts Mr. Brooke obtained from other campgrounds on the reservation.[44]  Eagle Bear argues this evidence supports Mr. Brooke's understanding that the Blackfeet Nation did not enforce the lodging tax until it attempted to collect the tax from Eagle Bear in and after 2016.[45]

During the evidentiary hearing, Mr. Brooke anecdotally identified several other privately owned and tribally owned campgrounds within the Blackfeet Nation reservation boundaries to which Eagle Bear apparently compares itself.[46] At least three campgrounds identified by Eagle Bear appear on the Blackfeet Nation's general ledger as having paid the lodging tax to the Blackfeet Nation in 2021 and 2022.[47]  The court does not find the timing of these payments to be evidence of arbitrary or unequal treatment.[48]  No evidence was offered to indicate

---

[42]   *Gerhart v. Lake Cnty., Mont.*, 637 F.3d 1013, 1022 (9th Cir. 2011) (reciting elements of an equal protection "class of one" claim while citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam), and *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008)).

[43]   ECF No. 215 Ex. GGGG.

[44]   ECF No. 209 Ex. 26.

[45]   Mr. Brooke's understanding was also informed by representations apparently made to Mr. Brooke by Mark Magee, who at some point was the Blackfeet Nation's Head of Leasing and Lands.  Mr. Magee did not testify at the evidentiary hearing.  While Mr. Brooke's hearsay testimony regarding these representations was admitted under Fed. R. Evid. 804(b)(3)'s "statement against interest" exception, the court gives little weight to the testimony.  The court is not convinced Mr. Magee would have sufficient knowledge or authority as to the Blackfeet Nation's tax enforcement practices because Mr. Magee had no role in handling campground taxation. *See* ECF No. 234 at 95:1–5.

[46]   ECF No. 234 at 65:6–25, 66:1–3, 66:10–18.  Eagle Bear has not clearly identified the "similarly situated" campgrounds to which the court should compare Eagle Bear and the record is devoid of any evidence to enable the court to find that any of the campgrounds identified are directly comparable in *all* material respects. *See SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1123 (9th Cir. 2022) (holding that "a class-of-one plaintiff must be similarly situated to the proposed comparator in all material respects" and adopting the Second Circuit's explanation that "class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves" (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006))).  In turn, Eagle Bear has not established the second part of the second element of its class of one claim.  For the sake of completeness, however, the court continues its analysis.

[47]   ECF No. 234 at 67:5–8, 18–19; *id.* at 222:3–8, 11–20; Ex. GGGG (Heart of Glacier RV Park, Montana's Duck Lake Lodge, and Glacier Elkhorn Cabins & Campground).

[48]   Mr. Brooke questioned the absence of the prior years on the ledger, surmising that the other campgrounds "must have just started paying" the tax.  ECF No. 234 at 222:20–22.  The record does not contain evidence to support that supposition.  Even if true that the Blackfeet Nation only recently started collecting the tax from *other* campgrounds, this does not indicate Eagle Bear has been intentionally treated differently from those campgrounds and actually supports a contrary conclusion.  There is no evidence in the record that the Blackfeet Nation has waived its legal rights to pursue other campgrounds to collect any previously unpaid lodging taxes and the Blackfeet Nation could still decide to bring litigation against other owners or operators to the extent permitted by Blackfeet Tribal Ordinance No. 51.

the general ledger represents an exhaustive list of campgrounds that have collected the tax from their users or paid the tax to the Blackfeet Nation. In fact, Mr. Gervais testified that just because a campground does not appear on the general fund ledger does not mean that the campground was not required to pay the tax.[49]

Similarly, the registration receipts collected by Mr. Brooke from other campgrounds do not establish that the Blackfeet Nation has not collected or attempted to collect the lodging tax from any other campground besides Eagle Bear.[50] The receipts indicate to the court only that some of those particular campgrounds did not collect the pass-through tax from Mr. Brooke as the user at that particular time.[51]

The record is further insufficient to support a finding that Eagle Bear is the victim of a "specialized push" in enforcement of the lodging tax. The Blackfeet Nation's enforcement of the tax apparently "ebbs and flows" depending on the priorities of the Tribal Council.[52] The court cannot conclude from this record that Eagle Bear is the *only* campground subject to such a "push." Any inconsistent or spotty enforcement which may be implied from the record is insufficient on its

---

[49] ECF No. 235 at 118:15–25. According to Mr. Brooke's testimony, even Eagle Bear paid the tax in 2022 but does not appear on the ledger as having done so. ECF No. 234 at 67:10–17.

[50] Indeed, Mr. Brooke confirmed during the evidentiary hearing that the Heart of Glacier receipt reflects the campground actually charged him with the lodging tax in 2019. *See* ECF No. 234 at 227:25–228:10.

[51] The court notes that two of the receipts containing handwritten notations that no lodging tax was collected are receipts from either tribally owned or tribal member-owned campgrounds. As previously explained, Eagle Bear has not identified the "similarly situated" control group. *Supra* note 46. To the extent that Eagle Bear alleges differential treatment between Eagle Bear as a privately owned campground and tribally owned campgrounds, Eagle Bear has not demonstrated that the basis for any such distinction was irrational. *See Seaplane Adventures, LLC v. Cnty. of Marin*, 71 F.4th 724, 730 (9th Cir. 2023) ("[T]he rational basis prong of a 'class of one' claim turns on whether there is a rational basis for the *distinction*, rather than the underlying government *action*." (emphasis in original; quoting *Gerhart*, 637 F.3d at 1023)). The Blackfeet Nation collects "all of the revenue from its campgrounds" without segregating out the tax as all amounts collected from a tribally owned campground would in turn be paid back to the Blackfeet Nation. ECF No. 235 at 119:16–19. This mechanism is consistent with the lodging tax's purpose as it serves as revenue collected by and for the Blackfeet Nation for the benefit of its members and residents of the reservation. *See* ECF No. 211 Ex. 16. In this regard, the Blackfeet Nation compares itself to the State of Montana, which the Blackfeet Nation argues also does not separately itemize a lodging tax against the user for state owned campgrounds (because the record is unclear about the state's practices and they are ultimately beside the point, the court notes this item merely as argument by the Blackfeet Nation). In any event, because the record does not support unequal treatment in the first instance, the court does not decide whether any distinction made by the Blackfeet Nation in accounting for the tax as between tribal and privately owned campgrounds is irrational. *See supra* note 30 and cited authorities.

[52] ECF No. 235 at 112:15–23, 114:15–24, 149:24–25, 150:1–9.

own to establish unequal treatment motivated by an intent to discriminate against Eagle Bear.[53]

Unequal treatment is the threshold element for an equal protection claim.[54] Because the record does not support a finding that the Blackfeet Nation intentionally treated Eagle Bear differently from other similarly situated campgrounds in its enforcement of the lodging tax, the court cannot conclude Eagle Bear's right to equal protection was violated.

In summary, the court cannot conclude either that the parties contractually agreed to exempt Eagle Bear from any lodging tax liability or that the Blackfeet Nation violated Eagle Bear's right to equal protection in its lodging tax enforcement. Therefore, Eagle Bear's categorical objection to the enforceability of this claim on those grounds will be overruled.[55]

## II. How Is the Amount of Eagle Bear's Liability Determined?

The parties disagree about several issues regarding how the amount of Eagle Bear's liability for lodging taxes should be calculated.

***First***, the parties take conflicting positions about the applicable statute of limitations and hence the correct lookback period to calculate Eagle Bear's petition date liability. The Blackfeet Nation relies on the unlimited period from Blackfeet Tribal Ordinance No. 51 to extend liability back to 1997. Eagle Bear argues that a five-year period contained in the Blackfeet Nation's Comprehensive Tax Code[56] should apply instead and buttresses this proposed period with the equitable doctrine of laches.[57]

---

[53] This is because a class of one claimant "must show that the discriminatory treatment 'was intentionally directed just at him . . . .'" *N. Pacifica LLC,* 526 F.3d at 486 (quoting *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir. 2001)).

[54] *Excess & Cas. Reinsurance Assoc. v. Ins. Comm'r,* 656 F.2d 491, 497 (9th Cir. 1981) ("Until [a party] can show that it is receiving disparate treatment, there is no need . . . to decide whether such treatment is violative of the right to equal protection.").

[55] Because the court concludes that neither of Eagle Bear's efforts to avoid the lodging tax succeed on their own merits, the court does not separately address the Blackfeet Nation's contention that Eagle Bear is bound by doctrines of waiver or estoppel from contesting liability for the tax. The Blackfeet Nation's theory is premised on the fact that Eagle Bear is pursuing concurrent litigation in state court against the State of Montana contesting liability for certain state sales tax and lodging facility use tax. *See* ECF No. 212 Ex. EEEE. The court expresses no views regarding any aspect of Eagle Bear's rights or claims against the State of Montana.

[56] *See* ECF No. 209 Ex. 34 at pp. 20–21 of 36 § 5.1.

[57] As with a statute of limitations defense, Bankruptcy Code section 558 makes an otherwise viable laches defense available to the bankruptcy estate representative and may provide a potential basis on which to disallow claims

Section 5.1 of the Blackfeet Nation's Comprehensive Tax Code reads:

Power of Tax Department to Seize and Sell

At any time within five (5) years after any person is delinquent in the
payment of any amount, the Tax Department forthwith may collect
the amount in the following manner: The Tax Department shall seize
any property, real or personal, of the person, not held in trust by the
United States, and sell the property, or a sufficient part of it, to pay the
amount due together with any interest or penalties imposed for the
delinquency and any costs incurred on account of the seizure and sale.

This language is not a statute of limitations or statute of repose. Rather, the
provision establishes a unique, temporally limited collection power for the
Blackfeet Nation's tax department. The tax department *could* exercise this
additional, optional remedy during the five-year period, but nothing in section 5.1
states that the underlying tax debt is barred or extinguished if this power is not
timely exercised. Likewise, nothing in section 5.1 eliminates whatever other
collection methods are available regarding a tax debt apart from the special power
to seize and sell. Here, the Blackfeet Nation is asserting an unsecured claim based
on an unpaid tax debt, not seeking to seize or sell any property. Because the
temporal limitation in section 5.1 of the Blackfeet Nation's Comprehensive Tax
Code only cabins the power provided by that section, the lapse of that period does
not render the underlying tax debt categorically unenforceable against Eagle
Bear.[58]

Instead, Blackfeet Tribal Ordinance No. 51 is the operative statute of
limitations, which provides a two-year limit for debts of less than $5,000 and an
unlimited period for debts exceeding that amount. Although the court does not
believe that section 5.1 can fairly be read to operate as a statute of limitations, any
lingering doubt is resolved by the rule that "statutes of limitations are construed

under Bankruptcy Code section 502(b)(1). *See supra* note 26; *SCA Hygiene Prods. Aktiebolag v. First Quality
Baby Prods., LLC*, 580 U.S. 328, 348 (2017) ("At common law, the word 'unenforceability' had a meaning that
encompassed laches.").

[58] A similar conclusion applies to Eagle Bear's argument based on Blackfeet Lodging Tax Code section 1.10(e)
and paragraph 32 of the Lease. Those provisions each clearly set forth a four-year records retention period, but
nothing in the language ever states that any liability of Eagle Bear will be extinguished once that period lapses
or that any remedy of the Blackfeet Nation to collect a debt will become unavailable.

narrowly against the government" and thus a "sovereign is given the benefit of the doubt if the scope of the statute is ambiguous."[59]

Moreover, Eagle Bear's desire to truncate the Blackfeet Nation's claim using laches is barred by the *nullum tempus occurrit regi* doctrine, pursuant to which no time runs against a sovereign unless that sovereign has submitted itself to a limitations period.[60] As a governmental unit with retained sovereignty and the power to make its own laws to govern its own affairs, the *nullum tempus* doctrine permits the Blackfeet Nation to sidestep a laches defense against enforcement of those laws.

To be sure, there is authority permitting laches to be used against an Indian tribe. For example, in *City of Sherrill v. Oneida Indian Nation*, the Supreme Court concluded that laches prevented an Indian tribe from asserting sovereign ownership over certain real property as a defense to paying property taxes due to the tribe's roughly 200-year delay in asserting its rights.[61] But the nature of the rights asserted in *City of Sherrill* differs in critical respects from the nature of the rights asserted here by the Blackfeet Nation. The Oneida Indian Nation sought various "equitable relief" as an additional remedy for "a federal common-law claim for damages for ancient wrongdoing in which both national and state governments were complicit" as previously recognized by the Supreme Court.[62] By contrast, the Blackfeet Nation seeks to enforce its own substantive tax law, enactment of which lies in the heartland of the Blackfeet Nation's retained sovereignty. The *City of Sherrill* opinion never suggests that laches should apply when an Indian tribe acts in a governmental capacity to enforce its own internal

---

[59] *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 95–96 (2006).

[60] *See, e.g.*, *Block v. North Dakota*, 461 U.S. 273, 294 (O'Connor, J., dissenting) ("The common law has long accepted the principle '*nullum tempus occurrit regi*'—neither laches nor statutes of limitations will bar the sovereign. The courts of this country accepted the principle from English law." (citations omitted)); *Board of County Comm'rs v. United States*, 308 U.S. 343, 350–51 (1939) (relying on sovereign status and immunity of Indian tribes to conclude that "state notions of laches and state statutes of limitations have no applicability to suits" brought on behalf of Indians); *United States v. Kirkpatrick*, 22 U.S. (9 Wheat.) 720, 735 (1824) ("The general principle is, that laches is not imputable to the Government; and this maxim is founded, not in the notion of extraordinary prerogative, but upon a great public policy."); *Saccullo v. United States*, 913 F.3d 1010, 1012 (11th Cir. 2019) ("One relic of the English legal tradition holds that, as a general matter, the sovereign . . . is not bound by statutes of limitation or subject to laches."); *United States v. Weintraub*, 613 F.2d 612, 618 (6th Cir. 1979) ("The rule that the government is exempt from the consequences of its laches and from the operation of statutes of limitations *Nullum tempus occurrit regi* had its genesis in English common law notions of prerogative of the Crown. The principle is well established in this country, but based upon the important public policy of preserving public rights and revenues from the negligence of public officers.").

[61] *See* 544 U.S. 197, 211–18 (2005).

[62] *See id.* at 202, 212, 216–17, 221.

laws enacted through its own political processes.[63]  The court has not located any authority indicating that the use of laches would be appropriate in this particular context and the court is doubtful that the Blackfeet Tribal Court would permit such a laches defense, particularly in the face of the Blackfeet Nation's codification of an unlimited limitations period in Blackfeet Tribal Ordinance No. 51.[64]

The court recognizes and appreciates the unfairness that arguably results from allowing the Blackfeet Nation to pursue tax claims (and interest thereon) based on events that happened more than a quarter century ago.  That unfairness, however, is a function of the unlimited limitations period the Blackfeet Nation chose to adopt in 1976 as an exercise of its sovereign powers and the *nullum tempus* doctrine.[65]  Although this bankruptcy court may broadly be considered a "court of equity," "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."[66]

---

[63]  In fact, the Supreme Court made a point of highlighting how the Oneida Indian Nation had "long ago relinquished the reins of government" regarding the real property and thus could not "unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue" due to its "long delay in seeking judicial relief."  *See id.* at 202–03.  Here, by contrast, the Blackfeet Nation has always retained "the reins of government" for purposes of adopting a lodging tax and thus there is no need to "revive" any sovereignty.

[64]  Two lower court opinions Eagle Bear cited at oral argument are also distinguishable.  *In re Sharpe*, 164 B.R. 753 (Bankr. W.D. Mo. 1993), applied laches against the IRS based on the IRS ignoring a bankruptcy case and later trying to clawback distributions made to unsecured creditors pursuant to an order that was entered years earlier.  Here, the claimed delay by the Blackfeet Nation all occurred prepetition, rather than during this bankruptcy case.  In addition, the *Sharpe* decision conflicts with the Supreme Court's 2007 *Travelers* ruling (cited and discussed below) insofar as that court relied on general equitable principles, rather than any section of the Bankruptcy Code, to effectively disallow the IRS's claim.  *See also In re Boston & Maine Corp.*, 2013 U.S. Dist. LEXIS 164508, at *14 n.26 (D. Mass. Nov. 19, 2013) (calling the *Sharpe* decision "unpersuasive" and "unclear").  *Jefferson Cnty. Dep't of Human Servs. v. Dos Santos (In re Dos Santos)*, 589 B.R. 413 (Bankr. D. Colo. 2018), applied laches to bar an untimely complaint seeking to have a debt declared nondischargeable.  Once again, the delay occurred during the bankruptcy case, rather than prepetition, and the issue involved was not the enforceability of a debt under applicable nonbankruptcy law.  In any event, the governmental actor in that case "never raised the argument that laches could not apply to a government agency" and the court's equitable balancing was expressly performed "[i]n the absence of such argument."  *See id.* at 423.  Here, by contrast, the Blackfeet Nation argued that laches is inapplicable.

[65]  *Nullum tempus* has been criticized as a doctrine that produces unfair or unjust results and some states have legislatively or judicially eliminated the doctrine.  *See, e.g.*, Michael J. Malaguti, *Nullum Tempus Occurrit Regi: An Antidemocratic Anachronism Survives in New Hampshire*, 51 N.H.B.J. 50, 52 (2010); Sigmund D. Schutz, *Time to Reconsider Nullum Tempus Occurrit Regi—The Applicability of Statutes of Limitations Against the State of Maine in Civil Actions*, 55 ME. L. REV. 373, 374–75 (2003); Thomas A. Bowden, *Sovereign Immunity from Statutes of Limitation in Maryland*, 46 MD. L. REV. 408, 408–09 (1987).  The decision whether to eliminate *nullum tempus* ultimately is one that must be made by each sovereign, typically through political processes.  *See, e.g.*, *State v. Lombardo Bros. Mason Contrs., Inc.*, 54 A.3d 1005, 1038 (Conn. 2012) (explaining that "it is not for this court to decide whether *nullum tempus* is sound policy generally" because "[t]hat decision rests solely and exclusively in the hands of the legislature, and, to date, the legislature has not seen fit to abrogate the doctrine of *nullum tempus*" (footnote omitted)).  Here, the sovereign Blackfeet Nation appears to have wholeheartedly embraced the *nullum tempus* concept in Blackfeet Tribal Ordinance No. 51.

[66]  *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988).

One confine of the Bankruptcy Code is the Supreme Court's clear instruction that claim disallowance has to be grounded in Bankruptcy Code section 502(b) and cannot be based solely on perceived unfairness or inequity to the debtor or other creditors if a particular claim is allowed.[67] Here, the only relevant portions of section 502(b) are paragraphs (1) and (2), which means that, except for disallowance of postpetition interest, the results of this claim litigation should track whatever outcome would obtain if Eagle Bear and the Blackfeet Nation litigated their disputes to judgment in the Blackfeet Tribal Court or another appropriate nonbankruptcy forum.[68] Because the court is not convinced that the Blackfeet Nation's lodging tax claim would be temporally limited against Eagle Bear outside of bankruptcy, the court is unable to conclude that any portion of the asserted claim (other than components that are less than $5,000 and hence subject to a two-year limitations period) is subject to disallowance on this basis.

**Second**, the parties offer competing constructions of Blackfeet Lodging Tax Code section 1.5(b). Eagle Bear argues that the statute imposes a net 5.0% liability on the operator of a lodging facility (i.e., a gross user tax of 6% of which the operator keeps 1%) whereas the Blackfeet Nation contends that the net liability is 5.94% (i.e., the operator keeps 1% of the 6% or 0.06% of the gross user tax).

Section 1.5(b) allows the owner or operator of a lodging facility "to retain one percent (1%) of the lodging tax for administrative costs and expenses." For purposes of the pending dispute, the court concludes this language is susceptible to more than one reasonable interpretation. On the one hand, the statute could plausibly be read tightly to key the 1% directly to the lodging tax amount actually collected by the owner or operator. On the other hand, the statute could plausibly be read more broadly to relate the 1% back to the 6% required to be collected from the gross receipts by the owner or operator, thereby allowing retention of 1% of the gross receipts. Because the plain language and the broader context of the statute permit multiple possible meanings, the text is ambiguous.[69]

Ambiguity in a statute may be resolved by consideration of any associated forms.[70] Here, the Blackfeet Nation promulgated a "Tax Reporting Form" for use

---

[67] *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449–54 (2007).

[68] *See, e.g.*, *In re Wilhelm*, 173 B.R. at 401 (analogizing bankruptcy claim litigation to "a non-bankruptcy lawsuit in which the creditor is attempting to recover money from the debtor").

[69] *See, e.g.*, *Alaska Wilderness League v. EPA*, 727 F.3d 934, 938 (9th Cir. 2013).

[70] *See, e.g.*, *Colon v. Mt. Creek Waterpark*, 465 F. App'x 186, 193 (3d Cir. 2012) (bolstering interpretation of a statute by reference to a related inspection report form); *In re Skiles*, 504 B.R. 871, 876 (Bankr. N.D. Ohio

in connection with payment of the lodging tax.[71]  That form quite clearly interprets the lodging tax law to permit the owner or operator to retain 1% of the gross amount collected and submit only "5% of Gross Receipts" to the Blackfeet Nation. Indeed, Mr. Gervais testified at the evidentiary hearing that his understanding of the requirements of the lodging tax law comports with the form.[72]  For purposes of this dispute, then, the textual ambiguity in Blackfeet Lodging Tax Code section 1.5(b) is dispelled by reference to the Tax Reporting Form and Mr. Gervais's testimony, both of which support Eagle Bear's interpretation of the statute.[73]

The prepetition existence and use of the Tax Reporting Form also raise fairness and notice concerns.  Even assuming the Blackfeet Nation's current interpretation of Blackfeet Lodging Tax Code section 1.5(b) is the better reading of the statute, there is no indication that Eagle Bear had notice of that interpretation before this action, which dilutes any deference the Blackfeet Nation might be entitled to regarding the meaning of its own tribal laws.[74]  Rather, for purposes of resolving Eagle Bear's claim objection, it is appropriate to hold the Blackfeet Nation to the construction of the statute communicated by its own Tax Reporting Form.  As such, the court adopts the calculation methodology used by that form.

---

2014) (observing how "an official form may help a court identify a term's meaning"); *City of Bellevue v. Hellenthal*, 28 P.3d 744, 748 (Wash. 2001) (using language and history of a form as interpretative aids regarding the correct meaning of a potentially ambiguous rule).

[71]  ECF No. 209 Ex. 30 at p. 10 of 10.  It is unclear whether the Tax Reporting Form is part of the same document as the remainder of Exhibit 30 or whether multiple documents were combined into a single exhibit—Eagle Bear's counsel represented that this exhibit was provided as a combined file by the Alexander Blewett III School of Law in response to a request for a copy of the Blackfeet Nation's lodging tax law.  Regardless, even if not part of the same original document, the Tax Reporting Form is plainly related to, and intended by the Blackfeet Nation to implement, the Blackfeet Lodging Tax Code.

[72]  *See* ECF No. 235 at 143:19–144:10.  The Blackfeet Nation suggests that Mr. Gervais's reference to "1 percent of the gross" was to "the gross amount of tax at the time it is collected."  *See* ECF No. 238 ¶ 75.  The context of the question posed to Mr. Gervais makes clear, however, that "the gross" reference was to gross lodging receipts by juxtaposing "1 percent of the gross" with "1 percent of the 6 percent."  ECF No. 235 at 143:23–25. In any case, based on the court's real-time observation of the live testimony, it was apparent that Mr. Gervais's testimony was expressing his agreement with Eagle Bear's position about how to calculate the tax.  *See, e.g.*, *Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983) (discussing how review of "a cold record" cannot substitute for the "credibility determinations of a fact-finder who had the opportunity to see live testimony").

[73]  The court's ruling about this issue is made only for purposes of the present chapter 11 case and based on the record before the court, including the Tax Reporting Form.  The court expresses no view about whether the Blackfeet Nation could effectively adopt a different interpretation of the statute on a going-forward basis by revising or eliminating the reporting form.  And the Blackfeet Nation of course retains the ability to amend the statute to remove any ambiguity.

[74]  *See, e.g.*, *Emp'r Sols. Staffing Grp. II, L.L.C. v. Office of the Chief Admin. Hr'g Officer*, 833 F.3d 480, 486–91 (5th Cir. 2016) (concluding that fairness, notice, and similar considerations weighed against imposing liability based on a governmental agency's litigation position that was not clearly stated in an applicable form or in any other authoritative source before the enforcement action at issue).

*Third*, the parties disagree whether the Blackfeet Nation can compound unpaid interest accruing on Eagle Bear's unpaid lodging taxes (i.e., include "interest on interest" as part of its allowed claim).

The default rule as a matter of general common law "is that in the absence of a contract therefor or some statute, compound interest is not allowed to be computed upon a debt."[75] Here, Blackfeet Lodging Tax Code section 1.13(d) contemplates that unpaid tax obligations "shall accrue interest at the rate of one percent (1%) per month, or part thereof, from delinquency until paid," which unambiguously describes only simple interest. The absence of any reference to compounding is especially notable when the Blackfeet Lodging Tax Code is juxtaposed with the Blackfeet Nation's TERO Ordinance (as defined and discussed below), the latter of which expressly provides that any interest on certain unpaid contractors' fees will be "compounded daily on all amounts owed."[76]

The Blackfeet Nation responds that nothing in the Blackfeet Lodging Tax Code *prohibits* compound interest and points to Mr. Gervais's testimony that compounding interest is the Blackfeet Nation's standard business practice. This is not a circumstance, however, where the absence of an express prohibition arguably

---

[75] *Cherokee Nation v. United States*, 270 U.S. 476, 490 (1926) (citing numerous authorities from several states). *See also, e.g.*, *Devex Corp. v. GMC*, 749 F.2d 1020, 1025 (3d Cir. 1984) (deciding under federal law that proposed compounding of interest is impermissible); *Stovall v. Ill. Cent. Gulf R.R. Co.*, 722 F.2d 190, 192 (5th Cir. 1984) (reciting "the general American rule that when interest is allowable, it is to be computed on a simple rather than compound basis in the absence of express authorization otherwise"); *Omar Int'l v. Alaf General Org. for Fodder*, 817 F. Supp. 394, 399 (S.D.N.Y. 1993) (describing request for compound interest as "an extraordinary remedy not ordinarily provided, unless a contract, statutory provision or special circumstances justify it" and denying such a request when the requesting party cited no specific supporting precedent); *Wombold v. Assocs. Fin. Servs. Co. of Mont.*, No. BDV 00-888, 2003 Mont. Dist. LEXIS 2364, at **27–28 (Mont. Dist. Ct. Aug. 27, 2003) ("The common-law prohibition against compound interest has remained the law of Montana subject only to the limited statutory exception set forth in § 31-1-109, MCA. . . . All other forms of compounding are prohibited by the common-law rule which views compound interest as a violation of public policy."). The Blackfeet Nation cites an opinion by the District of Columbia's local court of appeals asserting that there has been a "judicial shift toward favoring compound interest awards" occurring "fairly recently." *See D.C. Pub. Schools v. D.C. Dep't of Emp't Servs.*, 262 A.3d 213, 223 (D.C. 2021). This court has serious reservations about this supposed "shift" away from a common-law rule dating back decades, the support for which appears to be a handful of circuit court opinions regarding the calculation of prejudgment interest in the context of very specialized areas of federal law. In any event, even assuming there was some recent "shift" in the law, there is no indication that this "shift" occurred or started before the Blackfeet Lodging Tax Code was enacted in March 1992. Thus, the longstanding common-law rule would still inform the proper interpretation of the 1992 statute and still mandate the disallowance of compound interest that is not expressly authorized by the statute, which tracks with the actual result in the District of Columbia case. *See id.* at 223 ("Had Congress intended to authorize compound interest, contrary to the common law's then-extant default rule permitting simple interest alone, it likely would have said so expressly or, at the very least, we would see some evidence of that intent in the legislative history. But there is none."); *id.* at 228 (affirming conclusion that claimant "was entitled to only simple interest on her award").

[76] *See* ECF No. 212 Ex. FFF § 2-204.

equates to implied permission.[77]  Rather, the legal starting point is that compounding is not permitted unless expressly authorized and the Blackfeet Lodging Tax Code unambiguously does not include such authorization.  Without any viable statutory hook for compounding, the Blackfeet Nation's business practices are not relevant to determining what the Blackfeet Lodging Tax Code permits as a legal matter.  The combination of a default rule of common law with an unambiguous statutory text leads inexorably to the conclusion that the Blackfeet Lodging Tax Code only permits simple interest at 1% per month to be added to any lodging tax amounts owed by Eagle Bear.  Because the Blackfeet Nation's claim is unsecured, the accrual of additional interest generally stops on the petition date.[78]

The Blackfeet Nation further cites a decision holding that an award of compound interest might be appropriate in the context of a solvent chapter 11 debtor.[79]  This citation misses the mark for two reasons.  First, the parties' presentations at the evidentiary hearing did not address whether Eagle Bear is solvent, which means the court cannot (and does not) make any findings about that issue at this time.  Second, the cited decision is clear that its analysis concerned "post-petition, non-contractual interest awards (as distinguished from pre-petition interest awards),"[80] which is not the question now before the court.  The question before the court requires an assessment of the Blackfeet Nation's prepetition rights against Eagle Bear under applicable nonbankruptcy law; issues about chapter 11 plan confirmation requirements are analytically distinct and for another day.[81]

Although the Blackfeet Nation has the right to make and be bound by its own laws, those laws must be interpreted and applied as written and against the backdrop of generalized legal principles.  Here, the established common-law rule in 1992 prohibited compound interest unless expressly authorized and the Blackfeet Lodging Tax Code unambiguously does not contain such authorization.

---

[77]  *See generally Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1366, 1374 (Ct. Int'l Trade 2012) (observing how "the absence of an express statutory prohibition does not render permissible all that is not expressly prohibited").  Since the baseline legal rule is that compound interest is prohibited unless affirmatively authorized, an express prohibition in the statute would be duplicative of the baseline rule and thus unnecessary.

[78]  *See, e.g.*, 11 U.S.C. § 502(b)(2); *Ad Hoc Comm. of Holders of Trade Claims v. Pac. Gas & Elec. Co. (In re PG&E Corp.)*, 46 F.4th 1047, 1053 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 2492 (2023).  As the *PG&E* opinion details, if Eagle Bear is a solvent debtor, then postpetition interest might need to be paid in order to confirm a chapter 11 plan.  This raises unaddressed factual issues and confirmation issues, rather than claim-objection issues, and thus the court expresses no views about what may be required to confirm a plan in this case.

[79]  *See In re Manville Forest Prods. Corp.*, 60 B.R. 403, 404–05 (S.D.N.Y. 1986).

[80]  *Id.* at 404.

[81]  *See also supra* note 78.

As such, the Blackfeet Nation cannot assert an enforceable or allowable right to compound interest against Eagle Bear.[82]

### III.    Is the Resulting Claim Entitled to Priority Under Section 507(a)(8)?

The parties agree that at least some portion of the lodging tax claim is entitled to priority under Bankruptcy Code section 507(a)(8) but disagree about the specific source of that priority.  Eagle Bear maintains in its briefing that the claim belongs in (and thus is subject to the temporal limits within) subparagraph (A) while the Blackfeet Nation argues that subparagraph (C) (which has no temporal limitation) is the proper classification.  As the Collier treatise notes, the section 507(a)(8) categories "may not be mutually exclusive," meaning that "[i]f a tax claim fits within both categories, it will be entitled to priority under both categories."[83]  Therefore, the main question this court must decide is whether a claim for lodging taxes can be categorized in section 507(a)(8)(C).

"When working with the Bankruptcy Code, one must always start with the text."[84]  Section 507(a)(8)(C) encompasses "a tax required to be collected or withheld and for which the debtor is liable in whatever capacity."  On its face and even when tightly construed, this text fits comfortably together with the Blackfeet Lodging Tax Code.  The lodging tax is expressly "a tax required to be collected" from users of a lodging facility (*see* § 1.8(a)) and the owner or operator of the facility explicitly "shall be liable for all amounts required to be collected as a tax" (*see* § 1.8(b)), which renders that entity "liable in whatever capacity."  Thus, based on a plain and natural reading of these two statutes, the lodging tax liability created by Blackfeet Lodging Tax Code section 1.8(b) falls within the priority claim category in Bankruptcy Code section 507(a)(8)(C).

---

[82]    Contrary to the Blackfeet Nation's suggestion, this conclusion does not impinge on its sovereignty.  Sovereign governments can make law within a wide band of permissible parameters, but those governments must equally be bound by their established law as interpreted by courts.  *See, e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).  If the Blackfeet Nation wishes to impose compound interest on any unpaid lodging taxes going forward, then nothing in the court's decision limits the Blackfeet Nation's ability to amend the Blackfeet Lodging Tax Code to so provide.  Indeed, the TERO Ordinance shows that the Blackfeet Nation can and does expressly provide for compound interest when intended.

[83]    4 COLLIER ON BANKRUPTCY ¶ 507.11[4] (16th ed. rev. 2023).  *See also, e.g.*, *Carpenter v. Mont. Dep't of Labor & Indus. Unemployment Ins. Contributions Bureau (In re Carpenter)*, 540 B.R. 691, 698 (B.A.P. 9th Cir. 2015) ("One consistent theme in the Ninth Circuit decisions is that the § 507(a)(8) priority categories are not mutually exclusive and not applied mechanically.").

[84]    *In re King Mt. Tobacco Co.*, 623 B.R. 323, 329 (Bankr. E.D. Wash. 2020) (citing *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019)).

Case law confirms this conclusion.  For example, in *Shank v. Washington Department of Revenue (In re Shank)*, the Ninth Circuit Court of Appeals held that a Washington law requiring retailers to collect sales tax from customers on all retail sales and forward the collected funds to the state imposed a "trust fund tax" that was entitled to priority under section 507(a)(8)(C)'s statutory predecessor.[85] The Seventh Circuit Court of Appeals reached a similar conclusion regarding an Illinois "use tax" that was to be collected from purchasers of tangible personal property and then remitted by the seller, with a generalized "debt" being created for the seller if the seller failed to collect and turnover the required tax.[86]  The Third Circuit Court of Appeals followed suit in the context of a New Jersey law requiring restaurants to collect tax on food sold to their customers.[87]  The lodging tax imposed by the Blackfeet Nation is functionally a form of sales tax on the users of lodging facilities, which makes that tax akin to the taxes that multiple courts of appeals have given section 507(a)(8)(C) priority.[88]  As applied in Eagle Bear's circumstances, the lodging tax may also operate as "a tax on or measured by income or gross receipts" and therefore be entitled to priority under section 507(a)(8)(A),[89] but that classification does not strip the claim of priority under section 507(a)(8)(C) since the categories are not mutually exclusive.

Although the precise reasoning varies, "the vast majority of courts agree" that interest accrued prepetition on a priority tax debt is given the same priority as the underlying principal liability.[90]  As such, the Blackfeet Nation may properly

---

[85]  *See* 792 F.2d 829, 830–33 (9th Cir. 1986).

[86]  *See Rosenow v. Ill. Dep't of Revenue (In re Rosenow)*, 715 F.2d 277, 281–82 (7th Cir. 1983).  The Seventh Circuit Court of Appeals later followed *Rosenow* when concluding that an Illinois motor fuel tax constituted "an excise tax imposed on consumers that is collected by a third party, the distributor," and thus gave rise to a section 507(a)(8)(C) priority claim in a distributor's bankruptcy case.  *See Ill. Dep't of Revenue v. Hayslett/Judy Oil, Inc.*, 426 F.3d 899, 903–05 (7th Cir. 2005).

[87]  *See In re Calabrese*, 689 F.3d 312 (3d Cir. 2012).

[88]  Some lower courts have borrowed a five-part test from the Collier treatise when analyzing whether a particular tax creates a section 507(a)(8)(C) claim.  *See, e.g.*, *In re Serrano*, 545 B.R. 447, 452 (Bankr. D.P.R. 2016) ("For a claim to be afforded priority under section 507(a)(8)(C) it must satisfy all of the following five (5) factors: (i) the claim is held by a governmental unit; (ii) it is a tax claim; (iii) the tax is owed by a party other than the debtor; (iv) the tax must be withheld or collected from another party and then transmitted to a governmental unit; and (v) the debtor must be liable for the tax payment in some capacity.").  All these factors are met here.

[89]  The linkage between an entity's "gross receipts" and the lodging tax is not an inherent feature of the lodging tax.  For example, if a campsite operator sold products or services in addition to providing lodging (as many hotels or resorts subject to state lodging taxes do), then that operator's "gross receipts" would exceed the lodging-specific revenues on which the lodging tax is assessed.

[90]  *See In re Mosbrucker*, 220 B.R. 656, 659 (Bankr. D.N.D. 1998) (detailing "three lines of cases" under which "the same result obtains" and including prepetition interest in the overall claim given section 507(a)(8)(C) priority), *aff'd*, 227 B.R. 434 (B.A.P. 8th Cir. 1998), *aff'd*, 198 F.3d 250 (8th Cir. 1999).

include prepetition interest chargeable to Eagle Bear under the Blackfeet Lodging Tax Code within its section 507(a)(8)(C) priority tax claim.[91]

\* \* \*

To wrap up the discussion regarding Eagle Bear's lodging tax liability, the court concludes that:

(i)   Eagle Bear is liable for the tax imposed by the Blackfeet Lodging Tax Code;

(ii)   The principal amount of tax liability should be calculated by multiplying 5.0% times the gross accommodation charges collected by Eagle Bear in the second quarter and third quarter of every year from 1997 to 2021;[92] *provided, however*, that if the resulting net liability is less than $5,000 for any given quarter, then those quarterly amounts are barred by the two-year limitations period contained in Blackfeet Tribal Ordinance No. 51 and must be excluded;

(iii)   Simple interest of 1% per month will accrue on each applicable principal component of the lodging tax beginning thirty days after the end of each applicable quarter and ending on the May 23, 2022 petition date; and

(iv)   The entirety of the resulting combined claim (i.e., the sum of all principal components in excess of $5,000 plus all prepetition accrued interest on such components) is entitled to priority under Bankruptcy Code section 507(a)(8)(C).

Because the record does not allow the court to perform the calculations necessary to arrive at a final allowable claim amount, the parties will be directed to confer

---

[91]   The Blackfeet Nation has not asserted certain penalties that arguably might apply under the Blackfeet Lodging Tax Code. If such penalties had been asserted, that would raise a further question whether such penalties are "in compensation for actual pecuniary loss." *See* 11 U.S.C. § 507(a)(8)(G).

[92]   The Blackfeet Nation suggests that the quarterly calculation issue is a factual matter about which Eagle Bear has presented no evidence and thus should be unable to raise. Eagle Bear's position on this issue, however, comports with the Blackfeet Lodging Tax Code as a legal matter and the only factual disagreement would be about how to do some math. The court is unable to conclude whether the amounts in the Blackfeet Nation's proof of claim were calculated in a manner consistent with the statutory requirements, but since recalculation of the ultimate allowable claim amount is necessary anyway, the parties can and should review whether the final computation fully conforms with the statute.

about further calculations consistent with the court's conclusions and to submit proposed final amounts for the Blackfeet Nation's allowed lodging tax claim.

### Contractor Taxes & TERO Fees

The Blackfeet Nation proof of claim asserts a priority tax claim in the aggregate amount of $1,375,122.45 based on allegedly past due contractor excise taxes and tribal employment rights office (or TERO) fees, plus interest on the claimed unpaid taxes and fees. The asserted taxes and fees arise as a result of construction on and improvements to the campsite during 1997 through 2008 (after which the Blackfeet Nation contends the Lease was cancelled).

Blackfeet Tribal Ordinance No. 87 and Blackfeet Tribal Business Council Resolution No. 12-93, each as approved by the BIA in June 1993, establish a contractor's "excise tax of three percent (3%) upon the gross receipts of all prime contractors engaged in realty improvement contracts within the Blackfeet Indian Reservation."[93] The "gross receipts" on which this tax is levied are "the amount received by contractors in money, credit, property or other money's worth in consideration of the performance of realty improvement contracts on the Blackfeet Indian Reservation" without permitting various specified deductions.[94]

The TERO fee appears to have originated as a 0.5% fee included in Blackfeet Tribal Business Council Resolution No. 126-82, which fee was imposed on certain "covered rights construction contractor[s]" in order to "raise revenue for the operation of the" tribal employment rights office created by that resolution.[95] This resolution, along with several intervening resolutions, was later superseded by the Blackfeet Tribal Employment Rights Ordinance & Safety Enforcement Act (the "TERO Ordinance").[96] The TERO Ordinance imposes a fee of 4% on "the total amount of all phases of" an employer or entity's "construction contract (which includes architect and engineering contracts) in the amount of $100,000 or

---

[93] *See* ECF No. 209 Ex. 32 at p. 9 of 9 (in paragraph 2). The term "Contractors" is further defined in paragraph 1(1), which definition references "building construction," "other construction," and "environmental clean-up activity," along with "realty improvement contracts." *See id.* at p. 8 of 9.

[94] *See id.* at p. 8 of 9 (in paragraph 1(3)).

[95] *See* ECF No. 209 Ex. 27 at p. 4 of 5 (in paragraph 7).

[96] *See* ECF No. 212 Ex. FFF § 12-101.

more."[97]  The fee is typically due before work begins, but "a construction contractor" may be authorized to pay the fee in installments for good cause.[98]

By the plain terms of their foundational documents, the contractor's excise tax and the TERO fee are imposed only on certain contractors.  The parties agree that Eagle Bear is not and has never been such a contractor, which means Eagle Bear necessarily could not be an entity with any gross receipts or other amounts received via construction contracts on which a tax or fee might be assessed.

This would seem to end the analysis, but the Blackfeet Nation contends that Eagle Bear contractually agreed to render itself liable for the taxes and fees that would be due *as if* Eagle Bear were a contractor.  More specifically, the Blackfeet Nation primarily relies on a provision of the Lease stating:

> The Lessor has a 2% TERO tax presently in place for all new construction as well as a 3% construction tax for new construction. The parties agree that the TERO tax shall remain applicable to all new construction on the premises, however, Lessor shall waive all construction taxes for the first five years of the lease in order to encourage Lessee to make improvements and investments in the Campground/Recreation Facility and/or Complex.[99]

Paragraph 37 of the Lease cannot plausibly be read to impose any liability on Eagle Bear.  The first sentence is simply a declarative statement of background facts that were presumably true in 1997; this language imposes no obligations or liabilities on anyone.  The initial clause of the second sentence states that TERO tax "shall remain applicable," but says nothing about *who* is liable to pay the tax. Such a passive reference to the relevant actor reflects agnosticism about the actor's identity, which falls far short of foisting any obligation on Eagle Bear.[100]  Instead, the natural reading of this language is that the actor who would otherwise be liable under the still "applicable" legal regime (i.e., a contractor) will "remain" liable— nothing in the text alters the otherwise applicable law or states that Eagle Bear assumes a liability it would otherwise not have.  The remainder of the second

---

[97]  *See id.* § 2-201.A.

[98]  *See id.*  Other sections of the TERO Ordinance similarly reference "contractors" as the only entities subject to the fee.  *See id.* §§ 2-201.C., 2-204.

[99]  Lease ¶ 37 (this part of the Lease starts with an "A)" subpart designation, but since there is no "B)" or further subpart designated, the court has omitted this text).

[100]  *See, e.g.*, *Bartenwerfer v. Buckley*, 598 U.S. 69, 75–76 (2023).

sentence says nothing at all about anyone's liability, but instead recites a temporally limited waiver of the construction taxes—the language is absolutely silent about who will be liable for the taxes after the five-year period runs, which naturally means that the default rule of liability (i.e., only contractors) remains operative. Simply put, there is nothing in paragraph 37 of the Lease that can be construed as an agreement to pay anything by Eagle Bear or as an imposition of tax or fee liability on Eagle Bear. To be sure, the parties *could* have included such a provision, but doing so would require additional language (such as "the Lessor agrees to pay . . ." or "the Lessor will be liable for . . ." or "the Lessor will be a guarantor of . . .") that appears nowhere in the actual Lease. The court cannot rewrite the parties' agreement to add new terms which are wholly unsupported by the contractual text.[101]

The Blackfeet Nation suggests that the temporary waiver of construction taxes in paragraph 37 makes sense only if Eagle Bear is liable for the taxes. But this conclusion does not follow. A contractor bidding for a project on the campsite will, directly or indirectly, include the amount of any applicable taxes in its bid. If certain of those taxes have been waived, then the net, all-in cost of the project (i.e., the total amount ultimately paid to the contractor) will decrease and Eagle Bear will capture the difference. The waiver thus encourages Eagle Bear to build, consistent with the Lease's stated purpose of fostering "improvements and investments in the Campground/Recreation Facility and/or Complex."[102] This economic encouragement results *whether or not* Eagle Bear is directly liable for the waived tax, which means the presence of the waiver cannot function to bootstrap a direct liability that otherwise does not exist for Eagle Bear.

The other portions of the Lease referenced by the Blackfeet Nation provide even less support for its liability theory. Paragraph 11 of the Lease generally requires Eagle Bear to "abide by all laws, regulations and ordinances of the Blackfeet Nation, in force and effect during the term of this lease," but this requirement does not impose liability on Eagle Bear pursuant to tribal laws that otherwise do not apply to Eagle Bear's business. For example, the Blackfeet Nation's Comprehensive Tax Code imposes various taxes on sellers of alcohol and

---

[101] *See, e.g.*, *Monroe v. Cogswell Agency*, 234 P.3d 79, 83 (Mont. 2010).

[102] Testimony by Mr. Brooke and other evidence in the record explains why the Lease encouraged Eagle Bear to improve and invest in the lease property. The premises were in poor condition by 1996, so both parties to the Lease would have wanted to take steps to enhance that condition, which the parties appear to agree is what actually happened.

tobacco products.[103]  These taxes appear inapplicable to Eagle Bear since it is not the sort of person subject to such taxes and it would be illogical to somehow foist inapplicable taxes on Eagle Bear via a generalized reference to tribal laws in paragraph 11.  Likewise, paragraph 19 requires Eagle Bear to "pay, when and as the same become due and payable, all taxes [or] fees . . . levied during the term of this lease upon or against the leased land . . . for which either the Lessee or Lessor may become liable."  The contractor's excise tax and the TERO fee, however, are not taxes or fees for which either Eagle Bear or the Blackfeet Nation are liable, are not taxes levied upon or against the campground, and do not otherwise ever "become due and payable" by Eagle Bear.  Once again, paragraph 19's generalized covenant to satisfy certain otherwise applicable taxes falls short of obligating Eagle Bear to pay amounts that by default are payable only by certain contractors.  If the parties' bargain included an agreement by Eagle Bear to pay debts for which only its hired contractors would otherwise be liable, then the Lease should have included some language directly stating that agreement.  There is no such language in the Lease and extremely generalized provisions are an insufficient source from which the court could infer such an agreement.

In summary, Eagle Bear is not a contractor and thus is not liable for the contractor's excise tax or the TERO fee.  Nothing in the Lease imposes such a liability on Eagle Bear.  As such, Eagle Bear's objection to this category of claims will be sustained and the Blackfeet Nation's claims for contractor taxes and TERO fees will be disallowed in their entirety.[104]

## SUMMATION

Eagle Bear's objection to proof of claim number 11 will be sustained in part and overruled in part for the reasons discussed above.  The Blackfeet Nation is entitled to certain allowed priority tax claims to the extent detailed above.  The parties are directed to meet and confer about recalculation of a final allowable lodging tax claim amount consistent with this opinion and, on or before **November 17, 2023**, file either (1) a stipulation setting forth the parties' agreement regarding the final claim numbers or (2) competing submissions detailing their respective calculations and any remaining disagreements.  After the court's review of the parties' further filings (and any additional argument that the court may deem

---

[103]  *See* ECF No. 209 Ex. 34 at pp. 30–31 of 36 & pp. 34–36 of 36.

[104]  Since this ruling suffices to resolve matters regarding this category of claims, the court does not address other potential issues, such as how the specific amount of any taxes or fees should be calculated and whether any allowable amounts would be entitled to priority under Bankruptcy Code section 507(a)(8).

necessary), the court will prepare and enter an order regarding Eagle Bear's claim objection.[105]

This amended opinion addresses and resolves the motion for clarification filed as ECF No. 245, which motion is granted for the reasons set forth on the record at a telephonic hearing held on October 25, 2023.

DATED: October 25, 2023.

_____
WHITMAN L. HOLT
U.S. BANKRUPTCY JUDGE

---

[105] To avoid any confusion, the court does not grant or deny any relief via this memorandum opinion. Rather, this opinion provides the analysis that will support a forthcoming order. That future order will substantively and finally resolve Eagle Bear's claim objection and, if any party wishes to appeal, will be the triggering event for appellate purposes. *See, e.g.*, Fed. R. Bankr. P. 8002(a)(1)–(2); *United States v. $242,484.00 in United States Currency*, 389 F.3d 1149, 1153 (11th Cir. 2004) (en banc) ("A bedrock principle upon which our appellate review has relied is that the appeal is not from the opinion of the district court but from its judgment." (internal quotation marks and citation omitted)); *In re City of Harrisburg*, 462 B.R. 510, 513 (Bankr. M.D. Pa. 2011) ("Rule 8002 states unambiguously that the time for filing an appeal runs from the date of the entry of the order, not from the date of the entry of an opinion.").